UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SHERRYL HARPER, | CIVIL ACTION NO. |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| HARTFORD HEALTHCARE CORPORATION, | |
| Defendant. | JUNE 22, 2024 |

## COMPLAINT

### JURISDICTION AND VENUE

1. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, codified as amended at 42 U.S.C. § 12101, *et seq*.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4. Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission in Charge No. 16A-2022-00308 against Defendant on March 25, 2024.

### THE PARTIES

6. The Plaintiff, Sherryl Harper ("Plaintiff" or "Harper") is a natural person and a resident of the Town of Farmington and State of Connecticut.

THE MCMINN EMPLOYMENT LAW FIRM, LLC
1000 Lafayette Boulevard, Suite 1100 • Bridgeport, CT 06604 • T: (203) 683-6007 • F: (203) 683-9881

7. The Defendant, Hartford HealthCare Corporation ("Defendant" or "HHC"), is a Connecticut Corporation registered to conduct business in Connecticut and operates a location at 100 Pearl Street, 2nd Floor, CLO, Hartford, CT 06103, where Plaintiff was employed.

8. Defendant employs more than fifteen (15) employees.

## FACTUAL ALLEGATIONS

9. Harper is female.

10. Harper is Jewish.

11. Harper was hired by HHC in October 2020 as a System Director – Compliance and Internal Audit.

12. At all times relevant herein, Harper was supervised by Vice President for Compliance Anthony Mio ("Mio.")

13. Mio is male.

14. Mio is not Jewish.

**A. Mio Quickly Shows Signs of Disparate Treatment Towards Jewish Employees.**

15. In Fall 2021, Harper's direct report, Leah Persky ("Persky"), asked Harper to take time off for the upcoming Jewish holidays, Rosh Hashanah and Yom Kippur.

16. Persky is Jewish.

17. In a one-on-one meeting with Mio, Harper informed him that Persky would be taking time off for Rosh Hashanah and Yom Kippur.

18. Harper informed Mio that she would also be taking time off for Rosh Hashanah and Yom Kippur.

19. Mio did not say anything at first and then blurted out, "you're Jewish?"

20. Harper acknowledged that she was Jewish.

21. Mio was aware of Harper's religion.

22. Around the same time, Mio began to celebrate Christmas in the office and decorated the office with a Christmas tree and Christmas stockings throughout the office, as he had done for the past three years.

23. While Christmas decorations were being set up in the office, Perksy asked Harper if she could have a menorah put up along with the Christmas decorations.

24. Persky's request was reasonable.

25. Harper asked Mio about putting up the menorah.

26. Mio refused to permit Persky to put up a menorah.

27. Mio told Harper that it would not be appropriate to have a menorah in the office as there are no other Jewish employees in the department.

28. Mio told Harper that it would make the other employees "uncomfortable" if a menorah was displayed in the office.

29. Mio's stated reason for denying Persky's request was false.

30. Mio knew that Persky was not the only Jewish employee in the department.

31. Mio knew that Persky and Harper were Jewish.

32. Mio permitted decorations for a Christian holiday.

33. Mio refused to permit decorations for a Jewish holiday.

34. Mio showed preferential treatment for Christian holiday decorations.

35. Mio showed preferential treatment for Christian employees.

36. In late 2021 or early 2022, Harper mentioned to Mio that she was trying to find a home to purchase and would like to purchase her prior family home in West Hartford.

-3-

37. Mio asked Harper if she was going to move into "the reservation."
38. "The reservation" is a derogatory word used for a predominantly-Jewish area in West Hartford.
39. Harper was offended by Mio asking her whether she was going to move into "the reservation."
40. In 2022, Perksy had difficulty coming into the office on a continual basis.
41. Out of concern, Harper asked Mio what she could do to assist Perksy in becoming acclimated to the corporate culture at HHC.
42. Mio told Harper that Persky should be put on a performance improvement plan ("PIP.")
43. As instructed, Harper placed Persky on a PIP.
44. In April 2022 while Persky was on vacation, Harper received a complaint about Persky that related to a previous project that Persky had worked on several years before.
45. Mio told Harper to investigate the complaint.
46. Harper conducted a diligent investigation but found nothing to link Persky to the issue in the complaint.
47. Harper reported her findings to Mio.

**B. Mio Terminated Persky, a Jewish Employee, Without Cause.**

48. Despite having no cause for termination, Mio ordered Harper to terminate Persky's employment when Persky returned to the office.
49. Harper was not aware of any valid cause for Persky's termination.
50. To Harper's knowledge, Persky was the only Jewish employee terminated in the department.

**C. Harper was Not Immune from Mio's Anti-Semitic Comments and Insults.**

51. During Summer 2022, Mio and Harper were discussing their families while in the hallway.

52. Harper mentioned that her family had made many sacrifices, and her father was very frugal in order to afford the things they had.

53. Mio remarked, "Isn't that what you people are known for, being stingy?"

54. Mio's reference to "you people" being known as "stingy" was a clear, derogatory stereotype of Jewish people.

55. Harper was offended by Mio's reference to her family as "you people."

56. Harper was offended by Mio's reference to "her people" having a reputation of being stingy with money.

57. Harper was extremely embarrassed by Mio's statement, as her colleagues were able to overhear Mio's derogatory stereotype about Harper and Jewish people.

58. In Fall 2022, Harper asked Mio for an increase in salary for some of her staff members.

59. Harper asked Mio for a salary increase for Manager of Compliance Greg Mansfield ("Mansfield.")

60. When Harper asked if there would be a budget for an increase, Mio asked if she would want to pay Mansfield in shekels.

61. Shekels are units of Israeli currency.

62. Harper was offended by Mio asking Harper if she wanted to pay HHC employees in shekels.

63. While Harper is Jewish, Harper was not born in Israel and does not use Israeli currency.

64. Mio's use of "shekel" was a derogatory slight towards her religion.

65. Mio appeared to enjoy using the word shekel with her and would even laugh when he would say it.

66. Each time Mio said "shekel," Harper corrected him and said, "money."

67. Mio constantly used this offensive reference when communicating with Harper about staff raises.

68. During each of their bi-weekly meetings, Mio he would ask Harper if she wanted to "shekel" anyone.

69. In November or December 2022, Harper was wearing a sweater outfit when she picked up her bonus check from Mio's office.

70. Harper had put on some weight and the sweater set fit snugger than she anticipated.

71. Mio took this opportunity to make a sexually offensive comment, remarking, "didn't think people like you could fill out sweaters like that."

72. Mio again referred to Harper referring to her using a religious stereotype.

73. Harper was caught off-guard by Mio's comment about her appearance.

74. Harper was mortified by Mio's comment about her appearance.

75. Harper returned to her office for the entire day to avoid any other encounters with Mio.

76. In January 2023, Harper again asked for a raise for Mansfield.

77. Mio again asked if she wanted to "shekel" Mansfield again.

78. In her next meeting with Mio two weeks later, Harper asked for a raise for a new staff member, Devin Pierson ("Pierson.")

79. Mio asked Harper if she wanted to "shekel" Pierson.

80. Mio used a sexual tone when asking Harper whether she wanted to "shekel" Pierson.

81. Harper was offended by Mio's tone and use of the word shekel.

82. In January or February 2023, Mio used the word shekel with Harper again.

83. Harper pointedly told him it made her feel uncomfortable when he used "shekel" and that he should use the word money instead.

84. Harper has reasonable belief that she made Mio very uncomfortable when she would not accept his religious insults any longer related to her religious beliefs.

85. In February or March 2023, Harper's department received a hotline complaint regarding a swastika image saved to a hospital computer.

86. Swastikas are widely recognized as symbols appropriated by the Nazi Party.

87. Reviewing the inappropriate information and seeing the swastika images had an extreme emotional impact on Harper.

88. Harper was very upset and complained to Mio that she was uncomfortable with the case.

89. Harper asked Mio if he could take the lead on the case or assign it to another employee.

90. Harper told Mio that swastika images were meant to intimidate someone with a Jewish background like herself.

91. Harper told Mio that her family escaped the Holocaust, and because of that, she was very uncomfortable and did not want to take on the case.

92. Harper told Mio that the image in the complaint was offensive to her because of her religion.

93. Mio told Harper that Harper should use the investigation as an opportunity to get over it.

94. Mio told Harper to handle the case without assistance from him.

95. Mio refused to reassign the case to someone else.

-7-

96. Harper had to investigate the issue as Mio would not assist or reassign the case.

97. All assigned cases are tracked and discussed in a weekly team meeting.

98. Any cases that are not addressed in a timely manner are called out in front of the entire team.

99. Harper was concerned that if she did not address the case, it would become a topic on the weekly call.

100. Harper feared that her assignment being discussed would bring more attention to her religion, and that attention could be negative.

101. After Harper's objections to Mio's constant religiously-based insults and harassment, and her request not to be subjected to religiously-offensive material, Mio terminated Harper's employment under the guise of performance.

102. On April 10, 2023, Mio terminated Harper.

103. Mio terminated Harper during Passover.

104. Mio's stated reason for Harper's termination was poor performance.

105. Mio's stated reason for termination is false.

106. Harper had no performance issues while she was employed by HHC.

107. HHC has never identified any of Harper's alleged performance issues.

108. There is a causal connection between Harper's sex, religion, and objections to religious discrimination to Harper's termination.

109. During Harper's employment, HHC's Legal Compliance Department only had approximately forty to fifty total employees.

110. Of HHC's Legal Compliance Department's forty to fifty employees, three were Jewish women.

111. Within one year, HHC's Legal Compliance Department terminated three female Jewish employees, including Harper.

112. Within one year, HHC's Legal Compliance Department terminated all of its female Jewish employees.

113. HHC's Legal Compliance Department's systematic termination of all of its female, Jewish employees was part of a sinister effort to eliminate all female Jewish employees in the department.

114. As a direct and proximate result of HHC's wrongful conduct, Harper has suffered damages.

## COUNT ONE

### SEX AND/OR GENDER DISCRIMINATION, IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

115. Plaintiff hereby incorporates Paragraphs 1-114 with the same force and impact as if fully set forth herein.

116. Defendant employs more than fifteen employees.

117. Plaintiff was qualified for her position.

118. Plaintiff is a member of a protected class based upon her female sex and/or gender.

119. During her employment, Plaintiff was subjected to disparate treatment because of her female sex and/or gender.

120. During her employment, Defendant treated Plaintiff differently than similarly situated employees based on her sex and/or gender.

121. During her employment, Plaintiff was subjected to offensive and harassing conduct from her supervisor on the basis of her sex and/or gender.

122. Defendant condoned, tolerated, and ratified Plaintiff's supervisor's harassing conduct.

123. The harassing conduct was severe and/or pervasive.

124. The harassing conduct was offensive to Plaintiff.

125. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as harassing.

126. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as severe and pervasive.

127. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as offensive.

128. The harassing conduct interfered with Plaintiff's ability to perform her job duties.

129. As a direct and proximate result of the intimidating, offensive, and hostile environment created and sustained by Defendant, Plaintiff reported harassment on the basis of sex and/or gender.

130. Defendant had knowledge of Plaintiff's supervisor's harassment of women, including Plaintiff, that created a hostile working environment.

131. Defendant failed to take any corrective or remedial action.

132. Defendant's actions amount to discrimination on the basis of sex and/or gender.

133. Defendant created and sustained an environment of severe and pervasive harassment on the basis of sex and/or gender.

134. The above prescribed discriminatory actions were taken against Plaintiff because of her female sex and/or gender.

135. Plaintiff suffered adverse employment actions, including, but not limited to, termination on April 10, 2023.

136. There is a causal connection between Plaintiff's female sex and/or gender, Plaintiff's supervisor's harassing and offensive behavior, and Plaintiff's termination on August 10, 2023.

137. Defendant's conduct is unlawful and in violation of Title VII.

138. Defendant violated 42 U.S.C. § 2000e, *et seq* by harassing and discriminating against Plaintiff on the basis of her female sex and/or gender.

139. Defendant violated 42 U.S.C. § 2000e, *et seq* by terminating Plaintiff on the basis of her female sex and/or gender on April 10, 2023.

140. As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

141. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

## COUNT TWO

### RELIGIOUS DISCRIMINATION,
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

142. Plaintiff hereby incorporates Paragraphs 1-141 with the same force and impact as if fully set forth herein.

143. Defendant employs more than fifteen employees.

144. Plaintiff was qualified for her position.

145. Plaintiff is a member of a protected class based upon her religion, Judaism.

146. During her employment, Plaintiff was subjected to disparate treatment because of her religion.

147. During her employment, Defendant treated Plaintiff differently than similarly situated employees based on her religion.

148. During her employment, Plaintiff was subjected to offensive and harassing conduct from her supervisor on the basis of her religion.

149. Defendant condoned, tolerated, and ratified Plaintiff's supervisor's harassing conduct.

150. The harassing conduct was severe and/or pervasive.

151. The harassing conduct was offensive to Plaintiff.

152. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as harassing.

153. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as severe and pervasive.

154. A reasonable person in Plaintiff's position would view Plaintiff's supervisor's conduct as offensive.

155. The harassing conduct interfered with Plaintiff's ability to perform her job duties.

156. As a direct and proximate result of the intimidating, offensive, and hostile environment created and sustained by Defendant, Plaintiff reported harassment on the basis of religion.

157. Defendant had knowledge of Plaintiff's supervisor's harassment of Jewish people, including Plaintiff, that created a hostile working environment.

158. Defendant failed to take any corrective or remedial action.

159. Defendant's actions amount to discrimination on the basis of religion.

160. Defendant created and sustained an environment of severe and pervasive harassment on the basis of religion.

161. The above prescribed discriminatory actions were taken against Plaintiff because of her religion.

162. Plaintiff suffered adverse employment actions, including, but not limited to, termination on April 10, 2023.

163. There is a causal connection between Plaintiff's religion, Plaintiff's supervisor's harassing and offensive behavior, and Plaintiff's termination on April 10, 2023.

164. Defendant's conduct is unlawful and in violation of Title VII.

165. Defendant violated 42 U.S.C. § 2000e, *et seq* by harassing and discriminating against Plaintiff on the basis of her religion.

166. Defendant violated 42 U.S.C. § 2000e, *et seq* by terminating Plaintiff on the basis of her religion on April 10, 2023.

167. As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

168. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

## COUNT THREE

### RETALIATION,
### IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

169. Plaintiff hereby incorporates Paragraphs 1-168 with the same force and impact as if fully set forth herein.

170. Defendant employs more than fifteen employees.

171. Plaintiff engaged in protected activity by reporting her supervisor's harassment and discrimination against Jewish women, including herself.

172. Defendant retaliated against Plaintiff by failing to correct her supervisor's actions, harassing Plaintiff, and terminating Plaintiff on April 10, 2023.

173. The above retaliatory actions were taken against the Plaintiff because of her reporting harassment and discrimination on the basis of sex and/or gender and/or her religion.

174. There is a causal connection between Plaintiff's report of harassment and discrimination on the basis of sex and/or gender and/or her religion, Defendant's continued harassment and discrimination on the basis of sex and/or gender and/or her religion, Defendant's creation of a hostile work environment, and Plaintiff's termination on April 10, 2023.

175. Defendant violated 42 U.S.C. § 2000e, *et seq* by retaliating against Plaintiff on the basis of her report of harassment and discrimination on the basis of sex and/or gender and/or her religion.

176. As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress and the ability to enjoy life's pleasures.

177. Plaintiff seeks damages as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest;

5. Trial by jury; and,

6. Such other relief as the Court deems just, fair, and equitable.

>THE PLAINTIFF,
>SHERRYL HARPER
>
>By: _____/s/_____
>Michael C. McMinn (#ct27169)
>**THE MCMINN EMPLOYMENT LAW FIRM, LLC**
>1000 Lafayette Blvd., Suite 1100
>Bridgeport, CT 06604
>Tel: (203) 683-6007
>Fax: (203) 680-9881
>michael@mcminnemploymentlaw.com
>
>COUNSEL FOR PLAINTIFF